IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARK A. HODGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-5016-CV-S-NKL-SSA |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social | ) | |
| Security Administration | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This suit involves two applications made under the Social Security Act (the Act). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq. The second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. On December 1, 2004, following a hearing, an administrative law judge (ALJ) rendered a decision, finding Plaintiff was not "disabled" as defined by the Social Security Act. (Tr. 18-26.) On December 20, 2005, the Appeals Council denied Plaintiff's request for review. (Tr. 9-11.)

Pending before the court is Plaintiff's Motion for Summary Judgment [Doc. # 12] seeking judicial review of the ALJ's decision. Because the Court concludes that the decision of the ALJ is supported by substantial evidence, the Plaintiff's motion for summary judgment is denied.

1

**I.    Factual Background**

Plaintiff Mark Hodges ("Hodges" or "Plaintiff") was born in 1953 and was 50 at the time of his hearing. He completed the eighth grade in school. (Tr. 46, 61.) Hodges has worked as a janitor, dispatcher, tank truck driver and construction worker. (Tr. at 69.) On March 1999, he was injured while working as a custodian for Chesapeake Schools. (Supp. Tr. at 123.) He reported significant low back pain and a heavy feeling in his legs to his treating physician, Anuradha Datyner, M.D., Ph.D. At that time, radiographs showed a right L4-5 disc herniation and a congenitally small spinal canal. Dr. Datyner prescribed DayPro and Skelaxin and told Hodges to return to work at the sedentary capacity with no bending. (Supp. Tr. at 124.)

Hodges returned to Dr. Datyner on July 29, 1999. While he reported that Hodges was slowly improving with conservative treatment, Dr. Datyner stated that Hodges had limitations of lifting no more than twenty pounds, no repetitive bending, scooting, crawling or twisting. An x-ray of the spine on February 15, 2000, revealed end stage degenerative disc disease of L5-S1, marked changes of spondylosis throughout the lumbar spine, significant disc space narrowing and possible autofusion of T1-2 L1 and narrowing of L1-2 and L2-3, and minor changes of spondylosis with some narrowing of C4-5 and C5-7. (Supp. Tr. at 113.)

Sidney Tiesenga, M.D., examined Plaintiff on February 25, 2000. (Supp. Tr. 110-12.) He noted that Plaintiff had degenerative disc disease and spondylosis, but he also observed that Plaintiff's complaints of neck and left shoulder pain were

"unsubstantiated by passive physical findings." (Supp. Tr. 110.) In terms of work restrictions, Dr. Tiesenga commented that Plaintiff "would not be suitable for heavy manual labor." (Supp. Tr. 110.)

On March 30, 2000, Dr. Datyner noted that Plaintiff had normal tone, strength, and sensation, and did not note any atrophy. (Supp. Tr. 118.) He stated that Plaintiff had significant "functional overlay." (Supp. Tr. 118.) The doctor later observed that Plaintiff had undergone a physical capacity evaluation, which had shown that Plaintiff exaggerated his symptoms. (Supp. Tr. 116-17.) In June 2000, Hodges reported that the steroid injections helped and he wanted to start work again. (Supp. Tr. at 116.)

Hodges filed his first application for Disability Insurance Benefits and Supplemental Security Income on May 18, 2001. (Tr. at 19.) Around May 2001, Hodges also moved in with his sister, Shelia Mabe. (Tr. at 63.) Robert King, D.O., examined Plaintiff in June 18, 2001. (Supp. Tr. 125-27.) Plaintiff told Dr. King that he had moved to Missouri because he had heard it was easier to get benefits here, and that he had not seen a local doctor, taken medication, or had any local treatments. (Supp. Tr. 125.) Plaintiff also said he could sit for one hour, stand for one hour, and walk one-quarter mile. (Supp. Tr. 127.) After examining Plaintiff, Dr. King did not find anything to prevent Plaintiff from employment. (Supp. Tr. 127.)

Hodges also sought treatment from Michael Clarke, M.D. On September 11, 2001, Dr. Clarke indicated that Hodges' x-rays were fairly dramatic and needed to be reviewed to fully appreciate his condition. Physical exam showed that he was tender with a very

3

limited range of motion. Dr. Clarke stated that Hodges could not do physical labor such as a custodian, but could possibly return to work as a dispatcher with medication. (Supp. Tr. at 147.) Dr. Clarke also concluded that Hodges was medically eligible for Medical Assistance and General Relief. (Supp. Tr. at 146.)

Hodges started treatment at Doctor's Hospital of Springfield on March 14, 2002. He reported lumbar pain with occasional radiation to both legs. (Tr. at 188.) An MRI was scheduled for the next week. The MRI revealed mild segmental spinal stenosis due to generalized disc bulging and a small posterior central disc herniation, left paracentral disc herniation, bilateral neural foraminal stenosis, and diffuse lumbar degenerative disc and facet joint disease. (Tr. at 187.) Hodges was subsequently referred to Dr. Clarke. (Tr. at 189.)

On June 11, 2002, Hodges returned to Doctor's Hospital of Springfield. He noted that Dr. Clarke was not helping his pain. He was diagnosed with hypertension, back pain, lumbar radiculopathy and obesity. (Tr. at 184.) Hodges was told to increase Ultracet and Neurontin and was scheduled with a neurosurgeon. (Tr. at 184.)

The next week, Hodges reported to Charles Cantrell, D.O., at the Pain Clinic. A decreased range of motion was noted in the lower back with muscle spasms. Hodges was prescribed Zanaflex and a Duragesic Patch. Dr. Cantrell stated that Hodges's main cause of pain was a herniated disk as well as neural foraminal stenosis bilaterally. (Tr. at 181.) Hodges continued to seek treatment at the Pain Clinic on a monthly basis.

On September 30, 2002, Dr. Clarke completed a Medical Source Statement-

4

Physical in regard to Hodges. He stated that Hodges could frequently lift five pounds; stand or walk two hours in an eight hour day or twenty minutes continuously; sit for a total of eight hours; sit continuously for fifty minutes at a time and is limited in his ability to push/pull; occasionally climb, balance, stoop, kneel, crouch, and bend. (Supp. Tr. at 157-159.)

On December 18, 2002, Dr. Cantrell discharged Hodges from the Pain Clinic because he had nothing else to offer Hodges after the epidural shots provided no relief. (Tr. at 163.) On January 16, 2003, Hodges returned to the Doctor's Hospital of Springfield complaining of back pain. His prescription for Kadian was increased. (Tr. at 204.)

Hodges went to the emergency room on February 15, 2003. He said he was twitching but a medical report noted that Plaintiff was not twitching when medical staff were not in the room. (Tr. 229.) The staff concluded that Hodges could be suffering from withdrawal or overmedication. He was started on Reglan for nausea and told to follow up with his treating physician. (Tr. at 229.) Hodges was diagnosed with weakness and muscle twitching and was discharged in an unchanged condition.

After the Appeals Council denied his first application for benefits in 2003, Hodges filed another application for Disability Insurance Benefits and Supplemental Security Income on February 21, 2003. (Tr. at 102-104; Tr. at 290.)

On February 25, 2003, Hodges was referred to Dr. Baker at the Pain Clinic. Dr. Baker noted that Hodges appeared to be in a moderate amount of distress, he had trouble

5

finding a comfortable position to sit, he appeared to have an appropriate affect, and he had marked tenderness with palpation over the lumbar spine. However, his muscle tone was normal, straight leg raise was negative "for the most part," and muscle strength was adequate. (Tr. 198). Hodges was diagnosed with lumbar spondylosis and facet syndrome. Dr. Baker stated that Hodges should undergo facet blocks medial branch technique. (Tr. at 198.) Hodges received a facet block injection on March 4, 2003. (Tr. at 162.)

On August 22, 2003, Hodges reported to Paul Olive, M.D., at the request of Dr. Baker. Hodges reported that he continued to have back pain. Physical examination revealed that Hodges was in obvious discomfort. He had a flat affect and moved extremely slowly from sitting to standing. Diffuse tenderness to palpation throughout his lumbar spine was noted. Mild lower extremity edema was also noted, but Dr. Olive observed that Plaintiff had full range of motion in his extremities and negative straight leg raising. (Tr. 282.) Dr. Olive diagnosed Hodges with severe lumbar spondylosis and mild spinal stenosis, but indicated that he was not a surgical candidate. (Tr. at 282.)

Medical records from Doctor's Hospital show that Plaintiff reported several times for various complaints. In July 2003, he reported constipation and numbness of the little finger, but did not mention back pain. (Tr. 278-79.) He had constipation complaints in November and October 2003, but did not appear to mention back pain. (Tr. 264-65, 267-68, 270.) Later, although the record is difficult to read, Plaintiff appears to have had difficulty with hypertension and renal insufficiency, and gouty arthritis. (Tr. 259, 253.)

6

It again appears as though Plaintiff did not mention back pain during these visits.

On August 6, 2004, Disability Determinations referred Hodges for a psychological evaluation. Dr. Wilson noted that Hodges' right leg was severely swollen. Hodges reported being beaten as a child and feeling depressed since that time. He reported suicidal thoughts as well as nightmare and flashbacks. Dr. Wilson noted that Hodges walked with great difficulty. He appeared to be in pain regardless of whether he was sitting or standing. He appeared to be in a mildly to moderately depressed mood and was occasionally on the verge of tears. His thought content and perception were depressed. (Tr. at 285.) Hodges was diagnosed with post-traumatic stress disorder, chronic moderate; panic disorder with agoraphobia; impulse control disorder; dysthymic disorder and antisocial personality disorder. He was assigned a GAF of 50 to 60. (Tr. at 285.)

On the same date, Dr. Wilson completed a Medical Source Statement-Mental. She stated that Hodges was markedly limited in his ability to understand and remember detailed instructions; his ability to carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; his ability to work in coordination with or in proximity to others without being distracted by them; his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; his ability to interact appropriately with the general public; his ability to accept instructions and respond appropriately to criticism

7

from supervisors; and his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 287-288.) Finally, Dr. Wilson noted that Hodges was markedly limited in the ability to travel in unfamiliar places and to set realistic goals or make plans independently of others. (Tr. at 289.) Dr. Wilson concluded that Hodges would not have the capacity to respond appropriately to supervision, co-workers, and usual work situations on a regular and continuing basis. (Tr. at 289.)

At his hearing before the ALJ, Hodges explained that he had difficulty sitting and had pain around his tailbone. He testified that he was able to be on his feet for fifteen to twenty minutes, sit for thirty to forty five minutes, has to lean back and to one side when sitting to help alleviate the pain on his tailbone, is able to walk for a block and is able to lift five pounds. (Tr. at 59-60.) Hodges' sister, Sheila Mabe, testified that Hodges suffered from severe pain in his back, hips and legs and he had to lie down most of the time. In fact, he stays at home except to go to the doctor. (Tr. at 63-64.)

## II.    Discussion

After consideration of the record, the ALJ determined that Plaintiff suffered from a back impairment, which was "severe" within the meaning of the Act. (Tr. 25.) The ALJ also determined that Plaintiff's impairments did not constitute an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4. (Tr. 25.) The ALJ also found that Plaintiff was not fully credible as to his alleged level of impairment. (Tr. 25.) Therefore, the ALJ determined Plaintiff retained the residual functional capacity to perform the full

8

range of sedentary work. (Tr. 25.) Based on this residual functional capacity, as well as the testimony of the vocational expert who testified at Plaintiff's hearing, the ALJ determined that Plaintiff retained the ability to return to his past relevant work as a dispatcher. (Tr. 25.)

### 1. Plaintiff's Subjective Complaints

Plaintiff generally argues that the ALJ incorrectly assessed his credibility. Plaintiff states that he used strong pain medication, and that he had not recently been accused of exaggerating his impairments. Pl.'s Br., pp. 10, 11. However, the primary question is not whether Plaintiff experiences the subjective complaints alleged, but whether those symptoms are credible to the extent that they prevent him from performing substantial gainful activity. *See McGinnis v. Chater*, 74 F. 3d 873, 874 (8th Cir. 1996). The Commissioner may discredit subjective complaints if there are inconsistencies in the evidence on the record as a whole. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). *See also, generally, Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). In this case, the ALJ cited several factors supporting his decision, including that Plaintiff has sought little treatment, that there is little objective evidence of an impairment sufficiently severe to account for Plaintiff's complaints, and that Plaintiff has made a variety of inconsistent statements regarding his allegations during his prior claim, and during this case. (Tr. 24.)

Plaintiff contends the ALJ overlooked the September 2002 opinion of Michael Clarke, M.D., who concluded that he was limited to lifting five pounds, in addition to other postural limitations. (Supp. Tr. 157-58.) Pl.'s Br., p. 8. However, Dr. Clarke

9

rendered his opinion prior to the relevant period in this case. (Supp. Tr. 157-58.) Indeed, his opinion was carefully considered by the ALJ who evaluated Plaintiff's claim as to this earlier period, a decision that was later affirmed by the District Court. (Tr. 85.) Because Dr. Clarke's opinion relates to an earlier period of time, it was not directly relevant to Plaintiff's residual functional capacity during the relevant period. Moreover, the ALJ's residual functional capacity findings in the current case are not entirely dissimilar to Dr. Clarke's opinion. The ALJ in the current case found Plaintiff limited to sedentary work, itself a significant limitation, indicating that the ALJ considered evidence of Plaintiff's limitations. (Tr. 25.) *See, e.g., Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006) (residual functional capacity contained "significant limitations, demonstrating that the ALJ gave some credit to the opinions of the treating physicians where the opinions were supported by the objective medical evidence"); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (the ALJ's having found Plaintiff limited to sedentary work was "in itself a significant limitation, which reveals that the ALJ did give some credit to [the treating physician's] medical opinions.").

On the other hand, since Plaintiff has raised issues related to a previously adjudicated period, there is considerable evidence in this case that Plaintiff has tended to exaggerate his subjective level of impairment. Plaintiff's former treating physician, Dr. Datyner noted in 2000 that Plaintiff had significant functional overlay, and that he had exaggerated symptoms during a functional capacity evaluation. (Supp. Tr. 116-18.) Other doctors from the previous period noted that Plaintiff's subjective claims were

10

Case 3:06-cv-05016-NKL   Document 15   Filed 01/29/07   Page 10 of 14

unsubstantiated (Supp. Tr. 110) and that Plaintiff told another doctor that he had moved to Missouri because he had heard that it was easier to get benefits here, despite the fact that he was not taking any medications or treatments since moving to the area. (Supp. Tr. 125.) *See O'Donnell v. Barnhart*, 315 F.3d 811, 818 (8th Cir. 2003) ("[A]n ALJ may discount a claimant's allegations if there is evidence that a claimant was a malingerer or was exaggerating symptoms for financial gain."). While these events occurred prior to the relevant period here, they nevertheless are relevant to an assessment of Plaintiff's credibility.

Moreover, there are indicators that Plaintiff may have continued to exaggerate. During the relevant period, Plaintiff visited an emergency room in February 2003, complaining of "twitching," but medical staff specifically observed that Plaintiff only twitched when doctors or nurses were in the room, that he did not twitch at all when examined surreptitiously. (Tr. 229.) While Plaintiff is correct that doctors did not specifically find that he was exaggerating during the relevant period, Plaintiff has also sought relatively infrequent treatment. While Plaintiff sought some treatment for back pain during the relevant period, the ALJ pointed out that Plaintiff visited the hospital many times in 2003 without making any mention of back complaints. (Tr. 264-65, 267-68, 270, 274-75, 278-79.)

Plaintiff next argues the ALJ overlooked the effect his obesity might have on his degenerative disk disease. Pl.'s Br. 9. To the contrary, the ALJ noted that Plaintiff was obese, but added that Plaintiff had apparently been obese for many years, without a

11

worsening of his condition or any significant impact on his ability to perform work. (Tr. 24.) Plaintiff claims that obesity "magnified" his pain complaints, but he fails to point to any actual evidence relevant to this issue that the ALJ overlooked when he reached his decision. Pl.'s Br., p. 9.

Plaintiff next argues the ALJ overlooked the extent of his mental limitations, particularly contending the ALJ overlooked the August 6, 2004 report of Eva Wilson, Ph.D. (Tr. 24, 285-89.) Pl.'s Br., p. 10. But the ALJ addressed Dr. Wilson's report and other evidence of Plaintiff's mental functioning at length. (Tr. 22-23.) The ALJ pointed out that Dr. Wilson believed Plaintiff was mainly limited due to pain, which affected his mental capabilities; but as the ALJ pointed out, other medical doctors believed that Plaintiff tended to exaggerate his claims. (Tr. 23.) Dr. Wilson was not a treating physician, and the ALJ was not required to give her opinion the deference often afforded to such treating sources. *See Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998) (one-time evaluation by a non-treating psychologist is not entitled to controlling weight). Because the ALJ articulated inconsistencies in Dr. Wilson's opinion that led him to conclude that she was not fully reliable in her assessment of Plaintiff's limitations, the ALJ's conclusion is supported by the record as a whole.

In summary, the ALJ identified inconsistencies in the record which provided a sufficient basis upon which to discount Plaintiff's contention that he is unable to perform even simple work.

**2. The ALJ Properly Determined Plaintiff's Residual Functional**

**Capacity, and Properly Determined That He Retained the
Capacity To Perform Past Relevant Work**

Having found that Plaintiff was only partially credible as to the alleged extent of his impairments, the ALJ went on to determine Plaintiff's residual functional capacity. The ALJ properly considered all of the evidence, and determined Plaintiff retained the residual functional capacity for sedentary work. (Tr. 25.) *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).

Having determined Plaintiff's residual functional capacity, the ALJ then compared that residual functional capacity with the demands of Plaintiff's past relevant work. (Tr. 25.) With the help of a vocational expert, the ALJ properly found that a person of Plaintiff's age, education, work history, and residual functional capacity could perform Plaintiff's past relevant work as a dispatcher. (Tr. 25, 70.)

Plaintiff argues that the ALJ did not elicit a reasonable explanation for the variance between the vocational expert's testimony and the Dictionary of Occupational Titles regarding the job requirements of his past relevant work as a dispatcher. Pl.'s Br. 11. Citing Social Security Ruling 00-4p (ALJ should seek to resolve conflicts between DOT and vocational expert testimony). While Plaintiff argues this as a matter of conflict between the vocational expert's testimony and the DOT, it appears more accurate to state that he believes the ALJ improperly found he could return to his work as a dispatcher because he claims he was unsuccessful in the job, and that he was fired from the job because he could not handle the work-related demands. Pl.'s Br., pp. 12-13. However,

Plaintiff's testimony actually suggests that he was let go from his previous work as a dispatcher not because of inability to perform the job, but because he was rude to an elderly customer, which he admits was not part of the dispatching job per se. (Tr. 51-52.) Thus, the ALJ properly determined that Plaintiff retained the ability to perform the past relevant work based on his own comparison of the requirements of the work, in addition to the vocational expert's testimony.

## III.     Conclusion

Because the Court concludes that the decision of the ALJ is supported by substantial evidence on the record as a whole, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 12] is DENIED and the decision of the ALJ is AFFIRMED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: January 29, 2007  
Jefferson City, Missouri